**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

                    **v.**                                         **1:05-CR-301**
                                                                        **(GLS)**

**CHARLES McFARLAND,**

                              **Defendant.**

**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE UNITED STATES:**

HON. GLENN T. SUDDABY                    RICHARD S. HARTUNIAN
United States Attorney                   Assistant U.S. Attorney
445 Broadway
218 James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**FOR THE DEFENDANT:**

HON. ALEX BUNIN                          PAUL J. EVANGELISTA
Federal Public Defender                  Assistant Federal Defender
39 North Pearl Street, 5th Floor
Albany, New York 12207

**Gary L. Sharpe**
**U.S. District Judge**

### Decision and Order

**I.  Introduction**

        Charles McFarland has been indicted for possessing a handgun as a

convicted felon, *see* 18 U.S.C. §§ 922(g) and 924(a)(2), and now moves to suppress two statements he made to police officers. *See Dkt. No. 11*; *see also* FED. R. CRIM. P. 12(b)(3)(C). His motion is granted and both statements are suppressed because: (1) his first statement was the result of custodial interrogation, and he was not advised of his *Miranda* rights; and (2) his second statement was the result of custodial interrogation, and it was not preceded by a voluntary waiver of his *Miranda* rights, nor was it voluntary under the due process clause. To the extent the motion seeks suppression on alternative theories, it is denied because: (1) his first statement was voluntary under the due process clause; and (2) his second statement did not violate the "ask first, *Mirandize* second" interrogation technique proscribed by *Missouri v. Siebert*, 452 U.S. 600 (2004).

## II. <u>Facts</u>

The essential facts are based on the court's evaluation of the following: the applicable burden of production and proof; the testimony of New York City Police Sargent Daniel Chiarantano, Bureau of Alcohol, Tobacco and Firearms ("ATF") Special Agent Marc Maurino, and New York State Department of Corrections Investigator Chris Martuscello; the suppression hearing exhibits; the parties' submissions; and the resolution

2

of credibility issues.  *See* FED. R. CRIM. P. 12(d); *see also United States v. Miller*, 382 F. Supp. 2d 350, 361-363 (N.D.N.Y. 2005) (burden of production and proof).

On September 20, 2000, a Smith and Wesson .40 caliber handgun was stolen from Lawrence Grimmer during a residential burglary in Schenectady, New York.  Four months later, Domiyon Taylor was arrested for the burglary, and told Schenectady police officers that McFarland took the gun from him during a street encounter.  On May 21, 2003 - almost two and one-half years after the burglary - Martin Diggs shot and wounded two New York City police officers.  The Smith and Wesson was recovered at the scene.

The following day, Chiarantano was asked to trace the gun's history. With the aid of a telephone, and information from a supervisor and a computer, Chiarantano learned that McFarland had once possessed the gun, that he had recently been arrested, and that he was then incarcerated in the Tombs, a New York City detention facility.

On the evening of May 23, 2003, Chiarantano went to the Tombs to interview McFarland.  Beforehand, Chiarantano knew:  McFarland was not a suspect in the Diggs shooting because he was in custody on state

3

criminal and parole violation charges at the time; McFarland had a prior felony conviction; and, if McFarland admitted prior possession of the handgun, his admission could result in his prosecution for possession of the handgun, or provide leverage to induce his cooperation. Despite that knowledge, Chiarantano had no interest in prosecuting McFarland. Instead, he was exclusively focused on the police shooting, the history of the handgun, and the potential utility, if any, of McFarland as a witness.

The interview lasted ninety minutes, and occurred in an attorney conference room. McFarland was escorted to the room by a uniformed corrections officer, and his handcuffs were removed. The corrections officer remained outside the door while McFarland, Chiarantano and two other police officers remained inside. The room was adequately lit, McFarland sat at a conference table, Chiarantano led the conversation, and McFarland was cordial throughout. Chiarantano told McFarland that he was conducting a witness interview to trace the history of the Smith and Wesson, and that McFarland was not a suspect. Although Chiarantano knew that McFarland might make incriminating statements, he did not advise McFarland of his *Miranda* rights. At some point during the ninety minutes, Chiarantano told McFarland that he could stop answering

4

questions at any time, but the government has failed to prove at what point that admonition occurred.

During the interview, McFarland admitted that he took the handgun from Taylor, and identified those who took it from him.  Additionally, Chiarantano asked McFarland for information concerning homicides or other violent crimes.  Chiarantano routinely asked such questions to gather police intelligence even though he knew those questions might result in incriminating admissions.  In response, McFarland disclosed information about a murder by Lamar Reid in the Capitol District area, and provided the name of an Albany Detective that Chiarantano could contact.  Seeking a *quid pro quo* for his disclosures, McFarland asked what Chiarantano would do for him.  Chiarantano responded that he would contact the Albany Detective and if McFarland's information proved useful, McFarland's cooperation would be brought to the attention of officials involved in McFarland's current difficulties.

As promised, Chiarantano subsequently called the Albany Police and shared McFarland's homicide information.  Two and one-half weeks later on June 12, two Albany Detectives met Chiarantano at the Ulster Correctional Facility where McFarland was then incarcerated.  Without

*Miranda* warnings, Chiarantano and the Detectives sought to interview McFarland.[1]  The conversation lasted twenty minutes, and was terminated when McFarland refused to answer questions.  He was upset because his earlier cooperation did not result in his release from jail.

Almost two years later, Maurino was cooperating with the Albany Police Department, and again focused on the earlier McFarland disclosure. Shawndell Smith had been murdered in 2001, and Albany's investigation had stagnated.  Lamarr Reid was a suspect, but there was insufficient evidence to arrest or prosecute him.  However, the police believed that McFarland's identification of Reid as the murderer was credible.  A plan evolved to compel McFarland's cooperation in the homicide investigation by leveraging his prosecution for possession of the Smith and Wesson. Because of uncertainty regarding the admissibility of McFarland's non-*Mirandized* admission to Chiarantano, Maurino decided to *Mirandize* McFarland, re-interview him, and surreptitiously record the conversation.

Maurino knew that McFarland had refused to answer the Albany Detectives' questions, and he anticipated that McFarland might again balk

---

[1]Chiarantano simply introduced the Detectives, and they conducted the interview.  He did not advise McFarland of his *Miranda* rights, and he was uncertain as to whether the Detectives did so.  The record is limited to that uncertainty, and given the burden of proof, the court concludes that there were no *Miranda* warnings.

6

if he knew that the investigative focus was to obtain incriminating admissions.  Therefore, he planned a ruse.  He decided to tell McFarland that he was simply seeking further clarification of details previously disclosed to Chiarantano regarding the Diggs shooting.  Before the interview, Maurino learned that McFarland had a prior record, including a 1999 conviction for felony drug possession, a 2001 conviction for the misdemeanor of resisting arrest, and a 2004 conviction for felony weapons possession.  He also knew that McFarland had served a prison sentence after his first conviction, and was then serving a second prison sentence as a result of his second felony conviction.  Despite his prior criminal record, McFarland had no familiarity with his *Miranda* rights.[2]

Before March 2, 2005, Martuscello orchestrated McFarland's move from a prison near Buffalo to the Washington Correctional Facility, a medium security prison near the Capitol District.  On March 2, Maurino and Martuscello questioned McFarland in a well lit and otherwise nondescript interview room which was surreptitiously wired beforehand.  McFarland was accustomed to state prison regulations, and arrived for the interview in

---

[2]The court reaches this conclusion because Maurino did not know the answer, and the government offered no proof to the contrary.

the company of a corrections officer.  When the interview ended thirty minutes later, McFarland left unescorted because he had a pass that permitted free movement within the facility.  During the interview, McFarland was uncuffed, and he sat across a table from Maurino and Martuscello.

At the outset, Martuscello identified himself as a New York State Inspector General's Office Investigator, and Maurino as an ATF Special Agent.  Maurino then used a preprinted card to advise McFarland of his *Miranda* rights as follows: "You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to consult with an attorney and to have them (*sic.*) present during questioning.  If you cannot afford an attorney, one will be appointed to represent you prior to questioning."  Under a header designated "The Waiver," the card scripted two additional questions as follows: "Do you understand your rights?  Are you willing to waive those rights and talk to me?"  Maurino did not ask those questions.  He did, however, state:  "We're in a facility, so I gave you your rights, do you understand that?"  McFarland responded:  "Yes."

During the suppression hearing, McFarland aggressively cross-examined Maurino regarding Maurino's subjective view as to whether

8

McFarland's answer reflected an understanding that he was in a "facility," or an understanding of his "rights." Maurino's subjective view is irrelevant. Objectively, the court concludes that McFarland's answer was an acknowledgment that he understood his *Miranda* rights. Given the objective circumstances, McFarland knew he was not required to answer questions. He was previously told as much by Chiarantano and he demonstrated his comprehension when he refused to answer questions during the Albany Detectives' interview. McFarland was accustomed to police confrontations in a prison setting, he clearly had no difficulty in communicating with the police, and he clearly understood his situation. Objectively, his affirmative answer reflected that he understood the first of Maurino's two unasked questions; namely, do you understand your rights? The critical issue, however, is whether his response can be objectively construed as an affirmative answer to the second unasked question; namely, are you willing to waive those rights and talk to me? The court concludes that it cannot. The objective circumstances fail to support the conclusion that McFarland's *sole* affirmative answer was *alone* sufficient to constitute a waiver of his *Miranda* rights.

Next, Maurino began to execute his ruse. He told McFarland that he

9

was engaged in a follow-up for New York City regarding the police shooting, and that he knew McFarland was not implicated in that crime. Maurino then referenced the prior McFarland-Chiarantano conversation, and the fact that McFarland was incarcerated when the police officers were shot. When McFarland disclaimed any knowledge of the police shooting, Maurino assured him that his alibi was solid, and that he was not a suspect in the police shooting. In response, McFarland said: "Then what's this for? I'm being arrested for what?" In turn, Maurino stated: "No. You're not being arrested for anything right now." He then pursued the ruse, and told McFarland that he was simply seeking further details in order to respond to inevitable questions that would arise during the Diggs attempted murder trial. In fact, Diggs had already been convicted, and was serving a state prison sentence. Maurino did not reveal that his true purpose was to gather incriminating admissions that could be used to leverage McFarland on a gun possession charge, and force his cooperation on the Reid homicide.

McFarland next sought to distance himself from his Chiarantano admissions, in essence claiming that he had said nothing, and just wanted the police out of his face. In response, Martuscello joined the conversation

10

and the following exchange occurred:

Martuscello: We know where the gun went to you and then we know where the gun went from you.  We're just trying to build that little bit of time line.  The reason you were issued your *Miranda* warnings, even though you in ... you're a New York State inmate, you still have rights, okay?  That's why I'm here, to make sure your rights are taken care of.

McFarland:  You sure about this?

Martuscello: I'm positive.  I work for the Department of Corrections, okay.  I work for the Inspector General's Office, Narcotics ... This is what I do every day.  I'm a representative of Commissioner Goord.  I'm here to ensure that your rights aren't violated.  That's why he read you your *Miranda*, okay.  This is ... Nobody is looking to give you any charges.  We're looking to build a time line and that's it.  This had to do with a cop shooting and you were in jail at the time.  You didn't shoot the cop, we know that.  All right.  I see you're getting a little bit of an attitude over there.

McFarland: I just didn't want to say anything ....

Martuscello: No, I know.  I Know.  If I were in your shoes I would too, I understand where you're coming from.  You already gave some statements to other people.  I wasn't there, I wasn't privy to that.  Now this is just clean up from whatever you told them, okay.  That's what's being discussed here.  And that's it, there's nothing more to it, okay.  He's the ATF.  He don't need me, I'm here because of you.  You belong to us whether you think you do or not.  That's why I'm here, okay?  Just so you understand what's going on.

McFarland: I'm no wise-ass going back to the City.  That shit was all ... to me.  I didn't have nothing to do with nothing.  I know nothing about no cop being shot, none of that shit.  You

11

see what I'm saying?  I didn't have no gun, none of that shit.
You know what I told them ... to tell you the truth, I don't
remember.  So what's the follow-up?  You come to interview
me.  This is your case.

Maurino then resumed the questioning, summarized McFarland's

earlier conversation with Chiarantano, and ultimately asked whether

McFarland got the gun from Domyion Taylor.  McFarland then directly

asked, "Am I going to be charged for having the gun?"  Martuscello

responded, "No."  Maurino added that the conversation was related to the

Diggs attempted homicide, and "it's ... not in my interest to charge you for

this."  McFarland then made admissions regarding his possession of the

gun.

After his initial admissions, McFarland again balked at further

conversation.  The following exchange then occurred:

McFarland: ... I don't want to jam myself up ... like I
jammed myself up right there ...

Martuscello: What's your fear?

McFarland: ... having my name labeled as a snitch....

Martuscello: Here's the problem from my standpoint.
You're in a medium correctional facility.  Okay? ... This is just
me being devil's advocate.  There's an active investigation
going on where members of outside law enforcement placed
the weapon that killed a cop in New York City in your hands at

12

some point.  Okay?  What their trying to do is create a time line
... If I can't figure out how ... [the weapon] ... got from you to the
murder, that leaves the Department of Corrections to believe
that you were involved in the murder and I need to update you
to a maximum security facility because you might now be a
murderer.

Thereafter, McFarland made further admissions.  At the conclusion of the

interview, McFarland again asked if he was being charged, and both

Maurino and Martuscello told him no.

McFarland did not testify at the suppression hearing.

## III.  Discussion

Whether McFarland's two statements must be suppressed hinges on

four overlapping issues: (1) whether both statements were voluntary within

the meaning of the Fifth Amendment's due process clause; (2) whether

McFarland voluntarily waived his *Miranda* rights before the second

statement; (3) whether *Miranda* warnings were required before the first

statement; and (4) whether the second statement violated the "question

first, *Mirandize* second" interrogation technique proscribed by *Missouri v.*

*Siebert*, 452 U.S. 600 (2004).

Since the first two issues depend on an assessment of

"voluntariness," the court addresses them jointly.  The third issue depends

on whether McFarland was subjected to custodial interrogation because the government concedes that he was not *Mirandized* beforehand.  The fourth issue is an alternative argument for suppression of the second statement.

### A. <u>Voluntariness of the Statements and the *Miranda* Waiver</u>

McFarland contends that both statements were involuntary, and that there was no voluntary waiver of his *Miranda* rights before the second statement.  The source for his claim that his statements were involuntary is the Fifth Amendment's due process clause ("[n]o person ... shall ... be deprived of life, liberty or property, without due process of law ..."), while the source for his *Miranda* waiver claim is the Fifth Amendment's self-incrimination clause ("[n]o person ... shall be compelled in any criminal case to be a witness against himself ...").  U.S. Const., amend. V.  Voluntariness is central to these interrelated claims, but they require distinct analysis.[3]

Only voluntary confessions are admissible under either the self-incrimination or due process clause.  *Dickerson v. United States*, 530 U.S.

---

[3]The court uses "waiver" to refer to the *Miranda* self-incrimination clause claim, and "due process" to refer to the involuntary statement claims.  It does so because language in confession cases is sometimes confusing, especially since voluntariness is central to the analysis.

428, 433 (2000).  Thus, a *Miranda* waiver and a statement that follows

must both be voluntary for the statement to be admissible.  *See Chavez v.*

*Martinez*, 538 U.S. 760, 773 (2003); *see also Colorado v.* Connelly, 479

U.S. 157, 169-70 (1986); *United States v. Orlandez-Gamboa*, 320 F.3d

328, 332 (2d Cir. 2003).  The government must prove voluntariness by a

preponderance of the evidence.  *See Missouri v. Seibert*, 542 U.S. at 610,

n.1 (2004) (citing *Connelly*, 479 U.S. at 169); *Lego v. Twomey*, 404 U.S.

477, 482-89 (1979).

Miranda is considered a prophylactic rule because the substance of

the warnings have no actual source in the language of the Fifth

Amendment.  Instead, *Miranda's* requirements are a judicial creation

designed to protect the self-incrimination clause.  Since *Dickerson*,

however, it is clear that compliance with *Miranda* is a constitutional

imperative.  *See Dickerson*, 530 U.S. at 438, 444.  *Miranda* recognizes that

coercive pressures are inherent in custodial interrogation, and that the right

against self-incrimination can be protected only if interrogation is preceded

by the requisite warnings and a voluntary waiver.  *Id.* at 435.  However,

*Miranda* protects against the possibility of coercion, not coercion itself.

Therefore, a statement following an involuntary *Miranda* waiver must be

15

suppressed even though the statement itself might be voluntary.  *Id.* at 444

("The disadvantage of the *Miranda* rule is that statements which may be by

no means involuntary, made by a defendant who is aware of 'his rights,'

may nonetheless be excluded ...").[4]  This is so because the failure to

comply with *Miranda* creates a presumption of compulsion.  *See United

States v. Patane*, 542 U.S. 630, 639 (2004).  By the same token, once

*Miranda's* requirements have been met, a defendant is hard pressed to

argue that his confession has been coerced.  *See Dickerson*, 530 U.S. at

444 (citing *Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984)).

Ultimately, however, a custodial statement is inadmissible at trial unless the

prescribed *Miranda* warnings have been administered, and a valid waiver

obtained.  *Missouri v. Siebert*, 542 U.S. at 608.

Typically, there are three issues in a *Miranda* analysis:  whether

*Miranda* warnings are necessary; if so, were they adequate; and if so, did

the suspect effectively waive his rights.  *See Anderson v. Smith*, 751 F.2d

96, 101 (2d Cir. 1984).  As to the first two issues, the court has factually

determined that the warnings preceding the second statement were

---

[4]Thus, although a *Miranda* violation may require suppression, a statement may be used to impeach a testifying defendant if it is not actually coerced.  *See Harris v. New York*, 401 U.S. 222, 226 (1971).

necessary and adequate.  As to waiver, *Miranda* states:

> The defendant may waive effectuation of these rights,
> provided the waiver is made voluntarily, knowingly and
> intelligently ... Likewise, if the individual is alone and indicates
> in any manner that he does not wish to be interrogated, the
> police may not question him.  The mere fact that he may have
> answered some questions or volunteered some statements on
> his own does not deprive him of the right to refrain from
> answering further inquiries until he ... thereafter consents to be
> questioned...
> In sum, the privilege is fulfilled only when the person is
> guaranteed the right 'to remain silent unless he chooses to
> speak in the unfettered exercise of his own will' ...
> [A] valid waiver will not be presumed simply from the
> silence of the accused after warnings are given or simply from
> the fact that a confession was in fact eventually obtained ...
> Moreover, any evidence that the accused was threatened,
> tricked, or cajoled into a waiver will ... show that the defendant
> did not voluntarily waive his privilege.

*Miranda v. Arizona*, 384 U.S. 436, 444-45, 460, 475-76 (1966) (internal

citation omitted).  There are three components to the waiver analysis;

namely, a defendant's decision to relinquish his rights must be voluntary,

knowing and intelligent.  Thus, relinquishment

> must have been voluntary in the sense that it was the
> product of a free and deliberate choice rather than
> intimidation, coercion or deception.  Second, the waiver
> must have been made with full awareness of both the
> nature of the right abandoned and the consequences of
> the decision to abandon it.  Only if the 'totality of the
> circumstances surrounding the interrogation' reveal both
> an uncoerced choice and the requisite level of

> comprehension may a court properly conclude that
> Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *see also*

*United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997).  Insofar as

the comprehension component is concerned, the court has factually

resolved certain aspects of that inquiry.  Despite the suppression hearing

dispute, the court has found that the warnings were adequate and that

McFarland understood them.  Therefore, he preliminarily understood the

consequences of speaking since those consequences are incorporated in

the warnings themselves; namely, if he gave up his right to remain silent

and spoke, his subsequent statement could be used against him.  The

unresolved issue is whether, in light of the totality of the circumstances,

Maurino and Martuscello thereafter used intimidation, coercion, deception

or unwarranted trickery to undermine his understanding of those

consequences so that his ultimate decision was not the product of a free

and deliberate choice.

Various legal principles guide the evaluation of whether a *Miranda*

waiver is voluntary given the totality of the circumstances.  A waiver may

be written, oral, explicit or implicit, and there is no *per se* rule that governs

the inquiry.  *United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002).  If a suspect's response to questions concerning waiver are unclear, the police may ask limited questions to ascertain whether the suspect does understand and waive.  *See United States v. Ramirez*, 79 F.3d 298, 304-05 (2d Cir. 1996); *United States v. Szymaniak*, 934 F.2d 434, 439 (2d Cir. 1991); *Anderson v. Smith*, 751 F.2d at 103 (citations omitted).  If a suspect speaks after being advised of his rights, his speech is probative of his intention to waive.  *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).  The subjective intentions of the police are irrelevant to whether the defendant effectively waives his rights because what is on the minds of the police can have no objective impact on a suspect.  *Moran v. Burbine*, 475 U.S. at 423. However, if the police engage in objective behavior constituting impermissible trickery, deceit or coercion, that behavior may undermine a suspect's essential knowledge of his rights and the effect of abandoning those rights.  *Id.*  Furthermore, the corollary is also true; namely, a defendant's subjective reasons for waiving his *Miranda* rights are irrelevant. *See Colorado v. Connelly*, 479 U.S. at 169-71.  Thus, a defendant's mental state, education, background and experience are irrelevant to that aspect of waiver that focuses on police conduct.  Those factors may be relevant to

19

a suspect's understanding of his rights, but the voluntariness of his waiver

relies on police overreaching or coercion.  *Id.* at 170-71; *see also United*

*States v. Male Juvenile*, 121 F.3d at 41.  Thus:

> The inquiry whether a waiver is coerced 'has two distinct
> dimensions'.  First, the relinquishment of the right must have
> been voluntary in the sense that it was the product of a free and
> deliberate choice rather than intimidation, coercion, or
> deception.  Second, the waiver must have been made with a
> full awareness both of the nature of the right being abandoned
> and the consequences of the decision to abandon it.  Only if the
> 'totality of the circumstances surrounding the interrogation'
> reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda*
> rights have been waived.

*Colorado v. Spring*, 479 U.S. 564, 573 (1987) (internal citations omitted).

On the other hand, the voluntariness inquiry under the due process

clause focuses on "'whether a defendant's will was overborne' by the

circumstances surrounding the giving of a confession," *see Dickerson*, 530

U.S. at 434 (internal citation omitted), or stated differently, whether a

statement is the "free and unconstrained choice of its maker."  *Green v.*

*Scully*, 850 F.2d 894, 900 (2d Cir. 1988).  In order to make this

determination, the court must assess the totality of the circumstances

surrounding the interaction between the police and suspect, including the

characteristics of the accused, the conditions of the interrogation, and the

police conduct.  *See Dickerson v. United States*, 530 U.S. at 434; *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir. 1998).

Police trickery and deception are interrelated aspects of the voluntariness inquiry, and are relevant to both the waiver and due process analysis.  The issue is not, however, whether the police used tricks or deceit, but whether tricks or deceit led a suspect to believe that he could speak without consequences (*Miranda* waiver) or whether they undermined his ability to make a rationale choice about confessing (due process).  *See United States v. Gaines*, 295 F.3d at 299; *United States v. Male Juvenile*, 121 F.3d at 41; *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995); *United States v. Jaswal*, 47 F.3d 539, 542 ( 2d Cir. 1995) (*per curiam*).  Thus, police statements that are merely common sense factual observations are not material misrepresentations based on improper promises.  *See United States v. Ruggles*, 70 F.3d at 265.  Direct or implied promises to help are not coercive *per se*.  *Green v. Scully*, 850 F.2d at 901.  The failure to disclose the details of an investigation, or the fact that the suspect is a target of an investigation does not constitute affirmative deceit. *See Colorado v Spring*, 479 U.S. at 575; *Deshawn v. Safir*, 156 F.3d 340, 349 (2d Cir. 1998).  However, deliberate lies in response to a suspect's

questions concerning the investigation or whether he is a target are probative factors demonstrating involuntariness.  *See Lynumn v. Illinois*, 372 U.S. 528, 534-35 (1963); *Spano v. New York*, 360 U.S. 315, 323 (1959); *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992).

The court recognizes that its evaluation of the totality of the circumstances requires review of numerous factors, some of which are more or less relevant depending on whether the *Miranda* waiver or the due process inquiry is the subject of consideration.  Nonetheless, many of the factors overlap.  Accordingly, the court summarizes them as they relate to three broad categories: police conduct; characteristics of the accused; and the conditions of the interrogation.  Police conduct includes physical abuse, psychological coercion, threats, and material misrepresentations, or affirmative acts of trickery or deceit.  Characteristics of the accused include his experience, background, age, education, intelligence, and physical and mental state.  Conditions of the interrogation include whether *Miranda* warnings were provided (as necessary or not), the place of interrogation, its duration and conditions, the attitude of the police when conducting the interrogation, and the presence of counsel.  *See Colorado v Spring*, 479 U.S. at 574; *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997); *Green v.*

22

*Scully*, 850 F.2d at 901.  No single factor controls the analysis.  Instead, each case rests on the combination of its unique facts, and an assessment of whether the combination results in an involuntary *Miranda* waiver or a statement obtained in violation of a defendant's due process rights.  *Id.* at 902.

With these principles in mind, the court turns to its factual conclusions.  The first statement was presumptively coerced because McFarland was subjected to custodial interrogation without first being advised of his *Miranda* rights.  *See infra. § III(B), Custodial Interrogation and* Miranda*: The First Statement.*  However, the court concludes that the statement was otherwise voluntary within the meaning of the due process clause.

Given the objective circumstances surrounding Chiarantano's interaction with McFarland, there was no police-induced coercive environment.  McFarland had an extensive criminal record, had served time in prison on prior occasions, and was no stranger to the surroundings in which he was questioned.  He was in a well-lit prison room, uncuffed, and engaged in a non-threatening conversation.  There are no facts that suggest either physical or psychological deprivation.  While he was entitled

to *Miranda* rights and while the prosecution has failed to prove that he had any familiarity with his rights from prior police contacts, he was advised at some point that he was under no obligation to answer questions.  The court does not suggest that the advice was sufficient to pass constitutional muster, but it is indicative of the cordiality of the conversation. Furthermore, McFarland had some fundamental understanding of his situation as evidenced by the fact that he sought to use his cooperation as a bargaining chit for his pending problems.  That observation is buttressed by the fact that less than three weeks later, and again without the benefit of *Miranda* warnings, McFarland demonstrated that he understood his right to remain silent when he refused to answer questions of the Albany Police Detectives.

As for deception, there was none.  Chiarantano made no affirmative misrepresentations to induce McFarland to speak.  Chiarantano truthfully told McFarland that he was not a suspect in the police shooting, that the purpose of the questions was to trace the history of the gun, and that McFarland might be a witness, not a defendant.  The court credits Chiarantano's assertion that despite the fact that he knew McFarland's cooperation could lead to an incriminating admission, Chiarantano was

24

seeking a potential witness.  That is precisely why he did not administer *Miranda* warnings.  He promised that he would relay McFarland's intelligence disclosures to the Albany Police, and he did so.  Contrary to Chiarantano's intentions, the McFarland admissions surfaced two years later in a prosecution Chiarantano did not initiate.  Accordingly, the first statement was voluntary within the meaning of the due process clause.

The court turns to the totality of the circumstances regarding the *Miranda* waiver and the second statement.  There was nothing inherently coercive about the physical environment in which the questioning occurred. Just as McFarland was no stranger to the prison setting when Chiarantano talked to him in the Tombs, he was no stranger to the state prison setting. The conversation itself occurred in a well-lit, otherwise nondescript interview room, and McFarland was uncuffed.  He was escorted to the room by a prison official, but when the interview concluded, he simply walked out, free to return to his daily regimen.

The interview began with *Miranda* advice read from a preprinted card. Substantively, the rights adequately communicated to McFarland that he was under no obligation to speak, he had a right to be represented by counsel, and anything he said could be used against him.  Given

McFarland's response, his background and experience with police and

prison settings, Chiarantano's earlier admonition that he was not obligated

to speak, and McFarland's earlier refusal to speak to the Albany

Detectives, the court has factually concluded that he understood his rights.

Although the card had a specific question asking whether McFarland was

willing to waive his rights and speak, Maurino did not ask it.  McFarland's

positive response that he understood his rights is no indication that he was

willing to waive.  The court recognizes that there is no magic litany

controlling the waiver inquiry, and that Maurino was not legally required to

ask the waiver question.  The court also recognizes that McFarland's

decision to speak after he was advised of his rights is a relevant factor in

support of waiver.  Nonetheless, those factors are outweighed by other

negative factors.

Without first obtaining an effective *Miranda* waiver, Maurino and

Martuscello immediately, and affirmatively, engaged in a series of

conversations, the sole purpose of which was to deceive McFarland and

induce him to speak.  Maurino referenced the earlier Chiarantano

conversation, and lied to McFarland by telling him that the conversation

was essentially a further witness interview in connection with the Diggs

shooting.  No fool, McFarland immediately asked: "Then what's this for? I'm being arrested for what?"  Cautious in his response, Maurino told McFarland that he was "not being arrested for anything *right now*" (emphasis added), but softened the remark by again lying to McFarland, stating that the questioning was related to the impending attempted murder trial.  He did not truthfully relate that the real purpose was to obtain incriminating admissions and charge McFarland with a crime.  Instead, he affirmatively conveyed just the opposite.  Despite Maurino's efforts, McFarland still refused the invitation to incriminate himself.

At that point, Martuscello joined the coercive effort.  He assured McFarland that his sole purpose for being present was to protect McFarland's *Miranda* rights.  Again no fool, McFarland stated: "You sure about this?"  Martuscello then lied, and said: "Nobody is looking to give you charges."  It is clear to the court, that the essence of the conversation that immediately followed was an expression by McFarland that if they were seeking information for purposes of the Diggs shooting, he might be willing to talk to them, but not if they were seeking to charge him.  Satisfied with their affirmative assurances, he then made limited admissions.

Dissatisfied with the full extent of McFarland's admissions, Maurino

27

and Martuscello pressed on.  In direct response to a McFarland question as to whether he would be charged with the gun, both Maurino and Martuscello told him no.  Martuscello then threatened McFarland, in essence communicating that his failure to cooperate would result in a re-designation of his threat level, thus resulting in his movement to a maximum security facility.  *See e.g. McKune v. Lillie*, 536 U.S. 24, 41-42 (2002).

Given the totality of the circumstances as the court has described them, including affirmative acts of trickery and deceit by the police, McFarland did not voluntarily waive his *Miranda* rights nor were his subsequent statements voluntary within the meaning of the due process clause.  Accordingly, the second statement is suppressed for both reasons.[5]

---

[5]Although gratuitous and irrelevant to the analysis, the court offers a "softening" note to its discussion.  It does so because it has seen agency overreaction to language employed in a judicial decision.  Constitutional conversation in the Fifth Amendment arena often focuses on words such as "threats, deceit and coercion."  They are legal terms that refer to legal conclusions, and they do not necessarily translate well in the real world.  The court's conclusions do not mean to suggest that Maurino and Martuscello terrorized McFarland or otherwise trampled on his constitutional rights.  Numerous decisions recognize the value of confessions to law enforcement and the interests of society.  Those same decisions recognize that evidence of tricks and deception may make the listener uncomfortable, but it does not make the deception unconstitutional unless it affirmatively overwhelm a suspect's will.  The line the police may not cross is not always easily discernable.  The court hopes that ATF and the Department of Corrections understand as much.

**B.  Custodial Interrogation and *Miranda*: The First Statement**

The government concedes that McFarland was not *Mirandized* prior to his first statement, but argues that warnings were unnecessary because he was not the "investigative focus" of Chiarantano's questioning.  *A fortiori*, it concludes, the statement is admissible because McFarland was neither in custody nor interrogated.  McFarland counters that his case is indistinguishable from *United States v. Mathis*, 391 U.S. 1 (1968), which compels the conclusion that he was subjected to custodial interrogation. To resolve the dispute, the court turns to a survey of those decisions addressing custody and interrogation in the context of prison interviews.

As a starting point, *Miranda's* requirements may be simply stated: once in custody, a suspect may not be interrogated unless he is advised of his *Miranda* rights, he demonstrates that he understands them, and he voluntarily waives them, either explicitly or implicitly.  *See Yarborough v. Alvarado*, 541 U.S. 652, 661-63 (2004); *Thompson v. Keohane*, 516 U.S. 99, 102 (1995).  Thus, *Miranda* applies only if two preconditions exist; namely, custody and interrogation.  *See Thompson*, 516 U.S. at 102. Absent either, non-*Mirandized* statements are admissible unless they are otherwise coerced under due process standards.  While simply stated,

29

these principles are sometimes difficult to understand and apply.  *See e.g.*
*United States v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004) (custody
determination may be difficult).  That observation is particularly so when
prisoners are questioned.

In *Newton*, the Circuit sought to reconcile two of its prior decisions
regarding the custody determination.  *Id.* at 669-672.  In *Tankleff v.*
*Senkowski*, 135 F.3d 235 (2d Cir. 1998), custody was determined
according to the free to leave test: "The test ... is an objective one that (a)
asks whether a reasonable person would have understood herself to be
subjected to restraints comparable to those associated with a formal arrest,
and (b) focuses on the presence or absence of affirmative indications that
the defendant was not free to leave."  *Newton*, 369 F.3d at 669 (quoting
*Tankleff*, 135 F.3d at 243-44); *see also Yarborough v. Alvarado*, 541 U.S.
at 663 (citing *Thompson v. Keohane*, 516 U.S. at 112).  In *United States v.*
*Morales*, 834 F.2d 35 (2d Cir. 1987), the custody determination depended
on the coercive pressures test: "[The] 'in custody' requirement is met if
questioning was 'conducted in custodial settings that have inherently
coercive pressures that tend to undermine the individual's will to resist and
compel him to speak.'"  *Newton*, 369 F.3d at 669 (quoting in part, *Morales*,

30

834 F.2d at 38).  As between the two, *Newton* held that the free-to-leave test must be the first inquiry, and in fact, the ultimate test.  *Id.* at 670. *Newton's* conclusion was confirmed by *Yarborough*, decided five days after *Newton*, when the Supreme Court held that the free to leave test controls. *Yarborough*, 541 U.S. at 661-63.

*Newton* recognized that the free to leave test was entirely sensible when the suspect questioned was formerly at liberty.  *Newton*, 369 F.3d at 670.  However, "it makes little sense to ask whether the defendant had been questioned pursuant to formal arrest or arrest-like restraints ... [when] incarceration, not liberty, ... [is the] ... status quo."  *Newton*, 369 F.3d at 670.  Although a prison inmate is not free to leave, his incarceration does not automatically mean he is in custody.  *Id.* (citations omitted).  Thus, the coercive pressures test has vitality "in cases involving interrogation of individuals already incarcerated on other crimes."  *Newton*, 369 F.3d at 671.  The court should first focus on the free-to-leave test, and if it objectively determines that a reasonable person would have felt free to leave, there is no custody, and the inquiry is finished.  *Id.* at 672.  However, if a prisoner would have felt constrained, application of the coercive pressures test is appropriate."  *Id.*

31

Supreme Court decisions involving prison interrogation suggest that the Circuit's secondary coercive pressures test retains its vitality because it is not at odds with *Yarborough*.  In *Mathis v. United States*, 391 U.S. 1 (1968), Mathis was incarcerated on unrelated state charges when he was interviewed by an internal revenue agent.  The government argued that the agent's questions focused on administrative issues unrelated to criminal charges, and that *Miranda* did not apply because Mathis was in custody on unrelated matters.  Observing that the basis for custody was irrelevant and that criminal charges were possible, the Supreme Court reversed because Mathis' non-*Mirandized* custodial statement was erroneously admitted at trial.  The Court assumed, without analysis, that Mathis was in custody.  *Id.* at 4-5; *see also Inmates of Attica Correctional Facility v. Rockefeller*, 404 U.S. 809, 810-11 (1971) (*Miranda* applies to those in prison regardless of the focus of the interrogation)(Douglas, *dissenting*, citing *Mathis*, 391 U.S. at 4-5); *Oregon v. Mathiason*, 429 U.S. 492, (1977) (*per curiam*) ("[W]e have found the *Miranda* principle applicable to questioning which takes place in a prison setting during a suspect's term of imprisonment on a separate offense," citing *Mathis*, 391 U.S. 1. ).

In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Supreme Court

32

distinguished *Mathis*.  There, the police were investigating a murder and the suspect, Perkins, was incarcerated on unrelated charges.  Posing as a fellow inmate, an undercover officer engaged Perkins in non-*Mirandized*, voluntary conversations, and he made admissions.  Holding that the statements were admissible, the Court stated that *Miranda* does not apply if a suspect is unaware that he is speaking to the police because there are no "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely."  *Id.* at 295 (citing *Miranda*, 384 U.S. at 467).  The Court noted that possible coercion is present when an inmate speaks to a known police officer, but then added without further comment:  "The bare fact of custody may not in every instance require a warning even when the suspect is aware that he is speaking to an official, but we do not have occasion to explore that issue here."  *Illinois v. Perkins*, 496 U.S. at 295. The Court denied certiorari three weeks later in a case involving a *non-Mirandized* inmate confession to prison officials.  *See Bradley v. Ohio*, 497 U.S. 1011 (1990).  In dissent, Justice Marshall observed: "Because the Courts of Appeals have approached the issue of what constitutes custody in the prison setting in different ways, this Court should grant the petition

33

for certiorari to state clearly when *Miranda* applies in this context." *Id.* at 1012.  To date, the Supreme Court has declined the former Justice's invitation, and the test in this Circuit remains *Morales'* coercive pressures.

The court turns to *Morales* and its progeny as pertinent to an analysis of McFarland's circumstances.  Morales was a federal prisoner who dropped a packet containing what ultimately proved to be narcotics during a routine admissions physical.  He then made incriminating admissions in response to questions from a physician's assistant.  The physician's assistant had no investigative responsibility, and asked the questions out of curiosity, but did not administer *Miranda* rights.  *Morales*, 834 F.2d at 36. Morales argued that he was in custody when the questions were asked, and that the physician's assistant had an investigative purpose.  *Id.* at 37. The Circuit affirmed the trial court's refusal to suppress, and announced its coercive pressures test, explaining:

> *Miranda* must be strictly enforced in situations which implicate the concerns that motivated that decision.... The situations requiring that *Miranda* warnings be issued have generally been termed "custodial interrogation[s]."... Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak ... and (2) when the inquiry is conducted by officers who are aware of

34

> the potentially incriminatory nature of the disclosures sought ...
> Only questioning that reflects a measure of compulsion above
> and beyond that inherent in custody itself constitutes
> interrogation the fruits of which may be received in evidence
> only after *Miranda* warnings have been given.... The questions
> asked must have been both likely to elicit an incriminating
> response and to produce psychological pressures that will
> subject the individual to the "will" of his examiner.

*Id.* at 37-38 (internal citations omitted).  The second element is now

commonly referred to as the "investigative intent" requirement.  *See United*

*States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004). The *Morales*

decision did not mention *Mathis*.

A year later in *United States v. Willoughby*, 860 F.2d 15 (2d Cir.

1988), the Circuit applied the coercive pressures test, and declined to

suppress a non-*Mirandized* inmate statement made to an undercover

informant.  *Id.* at 17-18, 23.  The court emphasized that the conversation

was not initiated by the government, that the statement was otherwise

voluntary, and that incarceration alone is insufficient to make a statement

involuntary.  *Id.* at 23-24.  The Court distinguished *Mathis*, observing:

"[W]e believe that the mere fact of imprisonment does not mean all of a

prisoner's conversations are official interrogations that must be preceded

by *Miranda* warnings."  *Id.* at 23.  That observation predated by three years

35

the same point made in *dicta* by the Supreme Court in *Illinois v. Perkins*, 496 U.S. at 295 ("The bare fact of custody may not in every instance require a warning ..."). This point is precisely why McFarland's sole reliance on *Mathis* is unpersuasive.

A year after *Willoughby*, the Circuit considered an inmate confession to an informant in *Alexander v. State of Connecticut*, 876 F.2d 277 (1989) *("Alexander I")*, *judgment vacated sub. nom. Meachum v. Alexander*, 496 U.S. 914 (1990), *on remand*, *Alexander v. State of Connecticut* , 917 F.2d 747 (2d Cir. 1990) *("Alexander II")*. Without citation to *Morales* or *Willoughby*, the Circuit found that the informant was a police agent, and systematically questioned Alexander. *Alexander I*, 876 F.2d at 283. Therefore, it concluded, Alexander's *Miranda* rights were violated because he was in custody and his statement was not spontaneous or unsolicited. Instead, the statement resulted from police-induced psychological pressures. *Id.* at 283. Citing *Illinois v. Perkins*, the Supreme Court vacated, *Meachum v. Alexander*, 496 U.S. at 914, and on remand, the Circuit reversed its earlier decision. *Alexander II*, 917 F.2d at 751. There were two critical components to the Circuit's *Perkins* analysis:

[T]he confessing suspect had no intimation that he was in the

36

> presence of a government agent.  Because *Miranda* and its
> progeny were directed to prevention of coercion in custodial
> interrogation settings, the fears motivating exclusion of
> confessions are simply not present in the case at bar....The
> *Miranda* "custodial interrogation" involves two elements.  The
> suspect must be in police custody, and he must be aware that
> he is being interrogated by government authorities or their
> representatives.  Deception which takes advantage of a
> suspect's misplaced trust in a friend does not implicate the right
> against self-incrimination...

*Id.* at 750-51.

United States v. Rodriguez, 356 F.3d 254 (2d Cir. 2004) involved

another variant of the confessing inmate.  During a routine administrative

process designed to detect illegal aliens serving state prison sentences, an

immigration agent elicited non-*Mirandized* admissions from Rodriguez

concerning his citizenship and his last entry into the United States.  *Id.* at

256-57.  As a result of his admissions, Rodriguez was subsequently

detained administratively and then deported.  *Id.* at 257.  Four years after

the interview, Rodriguez was charged and tried for illegal reentry, and the

trial court admitted his earlier statement concerning his citizenship.  *Id.*

Expanding on *Morales'* coercive pressures test, the Circuit held that the

statement was admissible.  *Id.* at 256, 258-60.

First, the Circuit again emphasized that *Morales* has two

components:  (1) custodial settings that have inherently coercive

pressures; and (2) an interview conducted by officers who are aware of the

potentially incriminating disclosures sought.  *Id.* at 258 (citation omitted).

Noting that the trial court failed to analyze the custody prong, the Circuit did

not address it, instead focusing on the second element.  However, in *dicta*,

the Court stated:

> We have said that interrogation, for the purposes of *Miranda*,
> 'must reflect a measure of compulsion above and beyond that
> inherent in custody itself.'... Arguably, under *Morales*, for the "in
> custody" requirement to be met in this case, [the agent's]
> questions had to have been likely to produce coercive
> "psychological pressures" subjecting Rodriguez to the "will" of
> the examiner, which they may or may not have been.... We
> assume for purposes of this opinion that Rodriguez was "in
> custody" when he was interrogated.

*Id.* at 259 (internal citation omitted).  As for the "awareness of the potential

incriminatory nature of the disclosures sought," or investigative intent

requirement, the Circuit's analysis is especially instructive:

> [The agent] testified without contradiction that his interview of
> Rodriguez was conducted solely for the purpose of determining
> whether Rodriguez would be subject to administrative
> deportation after his release.  [The agent] also testified that he
> was not aware that information that he elicited could be the
> basis for criminal prosecution.  Indeed, the only information that
> Rodriguez gave [the agent] that might have been relevant to a
> prosecution was that Rodriguez, having entered the United
> States legally, had deliberately overstayed his visa.  This is not

38

a crime for which Rodriguez was ever prosecuted.

> The result of [the agent's] interview of Rodriguez was congruent with the purpose of the interview: Rodriguez was deported administratively. The information disclosed in the interview did not become relevant to a criminal proceeding against Rodriguez until three years later, when Rodriguez broke the law by fraudulently attempting to reenter the United States, without the permission of the Attorney General, using a fake passport. There is nothing in the record to indicate that [the agent] knew or should have known that evidence for an eventual prosecution would emerge from his administrative interview of Rodriguez.... No *Miranda* warning was required.

*Id.* at 259. The Circuit distinguished *Mathis* on the basis of the investigative intent requirement; namely, the administrative versus criminal focus of the interrogation. *Id.* at 260.

As *Rodriguez* clearly suggests, the first element of the coercive pressures test - custodial settings with inherently coercive pressures - focuses on the first predicate of the traditional *Miranda* inquiry; namely, custody. However, the second element - an interview conducted by officers who are aware of the potentially incriminating disclosures sought, or investigative intent - focuses on the second predicate; namely, interrogation. Traditionally, interrogation has been defined as express questioning or its functional equivalent, and includes:

> any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should

> know are reasonably likely to elicit an incriminating response
> from the suspect ... [T]he definition of interrogation can extend
> only to words or actions on the part of police officers that they
> *should have known* were reasonably likely to elicit an
> incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980) (emphasis in original).

As *Rodriguez* recognizes, however, certain questions in custodial settings simply do not constitute interrogation.  *See Rodriguez*, 356 F.3d at 259 n. 2 (booking, pedigree and identification questions).  Thus, the Circuit equated the immigration agent's administrative questions to routine pedigree questions, and found that they did not constitute interrogation because there was no investigative intent.[6]

This prison interrogation survey leads to the inescapable conclusion that McFarland's first statement resulted from custodial interrogation, that he was not first apprized of his *Miranda* rights, and that his statement must be suppressed as presumptively coerced under the Fifth Amendment. While the court disagrees that *Mathis* alone compels this conclusion, the

_____

[6]While as a trial court, this court might question the reasonableness of an immigration agent's testimony that he was clueless about the future criminal ramifications of an alien's administrative statements concerning alienage and illegal entry, all appellate courts are limited by the record below.  *Id.* at 259 ("There is nothing in the record to indicate that Agent Smith knew or should have known that evidence for an eventual prosecution would emerge from his administrative interview of Rodriguez.  The district court thus did not err in finding that Agent Smith was unaware of the potentially incriminating nature of the disclosures he sought ...").

court also disagrees that the government's interpretation of investigative intent survives scrutiny under the coercive pressures test.

McFarland was imprisoned.  It is senseless to ask whether he would have felt free to terminate the encounter or whether he was subjected to arrest like restraints.  *See Newton*, 369 F.3d at 669.  Instead, the answer to that question must be analyzed under *Morales'* coercive pressures test.  *Id.* Therefore, the issue is whether objectively, and in light of all of the circumstances, he was questioned in a custodial setting with inherently coercive pressures by a police officer who was aware of the potentially incriminating nature of the disclosures sought.

McFarland was alone in a prison interview room with three people he knew to be police officers.  He was not advised of his *Miranda* warnings, and before any questions were asked, he was not advised that he could refuse to answer.  Those objective facts demonstrate that McFarland was questioned in a classic custodial setting with inherently coercive pressures.[7]  As to investigative intent, Chiarantano knew that he intended to ask questions that might incriminate McFarland, but deliberately did not

_____

[7]As the court has already concluded, there is a difference between a classic custodial environment, and affirmative police conduct constituting actual physical or psychological coercion, or deception.  That distinction explains the court's earlier finding that the actual statement was not coerced.

administer *Miranda* warnings.  He knew that if McFarland, as a convicted felon, admitted possession of the Smith and Wesson, those answers might provide leverage to compel his cooperation as a witness.  While it is true that Chiarantano wanted a witness, not a defendant, honest answers to his questions would have provided either.  The government uses the summary definition of "investigative intent," as opposed to "awareness of the incriminating nature of the questions," and seeks to extend it to a situation dependent on the subjective intentions of the interrogator.  It offers no legal authority to do so, *see Government Brief* at 6-8, *Dkt. No. 15*, and the court has found none.  Questions designed to generate witness information which simultaneously generate incriminating information are simply not the equivalent of administrative or pedigree questions.  *See Rodriguez*, 356 F.3d at 259 & n. 2.  Therefore, McFarland's first statement is inadmissible because he was subjected to custodial interrogation without first being advised of his *Miranda* rights.

### C.  The *Siebert* Analysis

Because the court has suppressed the second statement on *Miranda* waiver and due process grounds, it is unnecessary to address McFarland's alternative *Siebert* theory.  *See Missouri v. Siebert*, 542 U.S. 600 (2004).

Nonetheless, and because of potential future litigation, the court briefly does so.

The court has previously discussed the effect of the Supreme Court's plurality opinion in *Siebert* on its longstanding rule established in *Oregon v. Elstad*, 470 U.S. 298 (1985). *See United States v. Miller*, 382 F. Supp. 2d at 375. *Seibert* addressed a so-called "ask first and *Mirandize* second" practice, and held that where a non-*Mirandized* statement is part of a coordinated and continuous interrogation designed to thwart *Miranda*, a subsequent statement preceded by adequate warnings fails to serve the intended function of the warnings; namely, apprizing the suspect of his right not to speak. *Id.* (citation omitted). As this court observed in *Miller*:

> *Seibert* does not alter the fundamental *Elstad* inquiry: namely, whether under the totality of the circumstances, an accused's subsequent statements were made following a knowing and voluntary waiver of rights. It does entail, however, a full consideration of factors that may bear additional relevance. Thus, the court should consider 'the completeness and the details of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.'

*Id.* (citations omitted). Ultimately, there are no rigid rules governing the

43

analysis such as a passage of time or break in the chain of events.  *Oregon v. Elstad*, 470 U.S. at 317.  Instead, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made... [T]he finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements."  *Id.* at 318.

The court acknowledges that there is a certain logical appeal to McFarland's *Siebert* argument given the facts of this case.  Clearly, the police attempted to use McFarland's first unwarned statement to induce the second.  Beyond that, however, this is not an "ask first, *Mirandize* second" case.  Almost two years elapsed between the first round of questioning and the second, and the police personnel were different.  The court is simply not prepared to extend *Siebert* to statements two years apart, especially where the facts can be adequately evaluated in the traditional *Elstad* context.  Accordingly, there was no "ask first, *Mirandize* second" technique employed during the second statement, and it is not subject to suppression on that basis.

## IV.  <u>Conclusion</u>

For the reasons stated herein, it is hereby

**ORDERED** that the motion of Charles McFarland to suppress his first statement is **GRANTED** because he was subjected to custodial interrogation without first being  advised of *Miranda* warnings, and it is further

**ORDERED** that the motion of Charles McFarland to suppress his second statement is **GRANTED** because it followed an involuntary waiver of his *Miranda* rights and because it was involuntary within the meaning of the due process clause, and it is further

**ORDERED** that the motion of Charles McFarland to alternatively suppress his first statement because it was involuntary within the meaning of the due process clause is **DENIED**, and it is further

**ORDERED** that the motion of Charles McFarland to alternatively suppress his second statement because it was involuntary within the meaning *Missouri v. Siebert*, 542 U.S. 600 (2004) is **DENIED**.

**SO ORDERED.**

Date:   March 24, 2006
        Albany, NY

Gary L. Sharpe
U.S. District Judge

45